## STANBALT REALTY COMPANY *v.* COMMERCIAL CREDIT CORPORATION

[No. 640, September Term, 1978.]

*Decided June 6, 1979.*

---

The cause was argued before MORTON, MOYLAN and MELVIN, JJ.

*Michael Lewis Freilich,* with whom was *Philip L. Marcus* on the brief, for appellant.

*Ward B. Coe, III,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The last hope of the appellant, Stanbalt Realty Company (Stanbalt), is the so-called "last antecedent rule" for construing the terms of a contract, to which rule Stanbalt clings with grim tenacity. This rule of construction, never adopted in Maryland, and of only marginal significance in the scattered jurisdictions that have called upon it, is too frail a reed to carry the appellant's burden.

Beginning in February, 1971, the appellee, Commercial Credit Corporation (Commercial Credit), leased the sixth floor of the Standard Oil Building in Baltimore City from Stanbalt's predecessor. The first lease was for two years and this was followed by two additional one-year leases. The penultimate lease was dated December 20, 1974, and extended from May 1, 1975, through April 30, 1976. It contained the following provision:

> "This lease extension is cancellable by either party upon ninety (90) days written notice."

During the period of this 1975-1976 lease, Commercial Credit was in the process of consolidating all of its offices into its own building. The operation which was utilizing the leased sixth floor of the Standard Oil Building was scheduled to move into the Commercial Credit Building sometime during 1975. That schedule, however, was not met and it became necessary to extend the lease agreement for another year.

Negotiations took place between Robert E. Outman, the manager of building operations for Commercial Credit, and Jerome Sachs, the managing agent of Stanbalt. Outman initially asked to have the lease extended under the same conditions contained in the then existing lease extension with the same cancellation clause. Sachs, on the other hand, informed Outman that he was receiving pressure from his banks and that he could better refinance the building if he could pin down lease terms with no cancellation option. Outman, for his part, refused to agree to a full year without possible cancellation. Sachs and Outman finally agreed to a guarantee of rental payments through the end of the calendar year (December 31, 1976) after which Commercial Credit could terminate under appropriate conditions. It was agreed that Sachs, representing Stanbalt, would draft the lease extension as he had done previously. The lease extension was ultimately signed and it contained the following critical provision which is the nub of the present litigation:

> "This lease extension is cancellable by either party upon ninety (90) days written notice on or after January 1, 1977."

During the summer of 1976, Commercial Credit gave 90 days notice to Stanbalt of its intended cancellation. Commercial Credit vacated the premises shortly before January 1, 1977, paying the rent through January 1. No rent was paid for the period from January 1 through April 30, 1977.

Stanbalt filed suit against Commercial Credit in the Court of Common Pleas of Baltimore City for the four months rent, along with interest and attorneys' fees. It also filed a Motion for Summary Judgment. Commercial Credit answered the declaration and motion and submitted an affidavit disputing certain facts asserted in the declaration and contained in Stanbalt's affidavit. Depositions were taken and a hearing was held on the Motion for Summary Judgment. Judge J. Harold Grady denied the motion, proceeded to trial and rendered a verdict in favor of Commercial Credit.

Stanbalt does not here contest the ultimate verdict upon the

merits but maintains strenuously that the Motion for Summary Judgment should have been granted in its favor.

The cancellation clause is at least arguably ambiguous. The critical qualifying phrase is "on or after January 1, 1977." The issue is whether this qualifying phrase qualifies the immediately preceding phrase "upon ninety (90) days written notice" or whether it qualifies the anterior preceding phrase "cancellable by either party." The cancellation provision may be construed two different ways:

(1) The term of the lease extension, from May 1, 1976, until April 30, 1977, is cancellable upon 90 days written notice provided that the notice is given on or after January 1, 1977, or
(2) Provided that 90 days notice is given, the lease is cancellable on or after January 1, 1977.

All parties are agreed that if the 90 days notice had to be given after January 1, 1977, an effective cancellation never occurred and Stanbalt should have prevailed in recovering the four months of lost rent. If, upon the other hand, the cancellation could occur anytime on or after January 1 (provided only that 90 days written notice had been given theretofore), an effective cancellation did occur and Commercial Credit should have prevailed. The only issue before the court was that of what the cancellation clause meant.

Judge Grady, after reading the two depositions and hearing argument on the Motion for Summary Judgment, concluded that the clause was ambiguous and denied the motion. At the subsequent trial of the case upon the merits, abundant testimony supported his ultimate conclusion in finding the Commercial Credit interpretation to be the one giving effect to the intention of the contracting parties. It is beyond dispute that the cardinal rule for construing ambiguities in contracts is to ascertain and give effect to the intention of the parties. *Garfinkle v. Schwartzman,* 253 Md. 710, 720, 254 A. 2d 667 (1969); *Mascaro v. Snelling & Snelling,* 250 Md. 215, 229, 243 A. 2d 1 (1968); *DWS Holdings, Inc. v. Hyde Park Associates, Inc.,* 33 Md. App. 667, 675, 365 A. 2d 554 (1976). This rule is

applicable whenever a contract contains an ambiguity, which is an expression capable of more than one meaning or of doubtful meaning. *Allen v. Steinberg,* 244 Md. 119, 127, 223 A. 2d 240 (1966).

Stanbalt does not (and, indeed, could not) question this resolution of the ambiguity upon the merits, once it is accepted that an ambiguity existed. It is rather the contention of Stanbalt that its vaunted "last antecedent rule" should have been invoked by Judge Grady at the summary judgment stage in order to determine that no ambiguity existed that needed to be resolved. Almost by way of *ipse dixit,* Stanbalt assigns to the "last antecedent rule" not the role, along with other rules of construction, of resolving an ambiguity in the terms of a contract but the preemptive role of foreclosing the possible ambiguity so that the other rules would never come into play.

Curiously, Stanbalt takes this rather obscure little grammatical usage, that sometimes is dignified with the label "rule" and sometimes is not, and assigns it a seat in the juridical hierarchy somewhere between the Magna Charta and the Statute of Frauds. Its true station is infinitely more modest.

The great professors of contracts, Williston and Corbin, in their respective multi-volume works do not even recognize the existence of any "last antecedent rule." In a merely subsidiary capacity, in the course of broader discussions of the use of grammar to discern the meaning of a contract, this particular grammatical usage is mentioned in passing without benefit of a formal label in a footnote in *American Jurisprudence 2d* and with benefit of a formal label in a footnote in *Corpus Juris Secundum.* In 17 Am.Jur.2d, *Contracts,* § 278 "Grammar," the following text refers to the use that may be made of grammar but also to the fact that grammatical correctness will never prevail over the true intention of the parties:

> "Although the grammatical construction of a contract is often a reliable signpost in the search for the intention of the parties, at times the language of

a contract, read as a whole and in the light of the circumstances surrounding its execution, may disclose an intention which would be thwarted by a strict grammatical construction; in such case the court is not bound to follow the signpost of grammatical construction, particularly when it appears to point in the wrong direction. Intention may be formulated in terms that are not grammatical."

A footnote to the last quoted sentence then makes reference to the grammatical usage now in issue:

"Thus, it is the general rule that unless the intention appears otherwise, *a relative word will be construed as referring to its nearest antecedent.* But in the event the context of the instrument shows that the relative word is not intended to apply to the nearest antecedent, it must be construed in such a way as to carry out the intention of the parties. The intent will not be defeated unless the defect is so serious, as absolutely to preclude the ascertainment of the meaning of the parties through the means furnished by the whole document and such extrinsic aids as the law permits." (Emphasis supplied)

In 17A C.J.S., *Contracts,* § 305 "Grammatical Construction" the main thrust of the text is that the rules of grammar are helpful but not controlling:

"While the court, in construing a contract, will not ignore the rules of grammar and grammatical construction of the language used, the grammatical construction of a contract will not be followed if a different construction will better give effect to the intention of the parties as shown by the whole instrument and the circumstances; and to give effect to an obvious and apparent purpose of a contract, grammatical errors may be corrected.

Rules of grammatical construction, however, are not to be disregarded where they serve to throw

light on the intent of the parties. *Thus, subject to exception where the intention of the parties appears to have been otherwise, a relative or qualifying word, phrase, or clause will be construed as referring to its nearest antecedent."* (Emphasis supplied)

A footnote to that text then gives the grammatical usage now in issue its formal label but also stresses its purely ancillary function:

"The 'last antecedent' rule is merely an aid to construction and will not be adhered to where remote antecedent is clearly intended."

What emerges is the following mildly helpful but unremarkable truism: GRAMMAR IS ONE HELPFUL TOOL, AMONG MANY, FOR DISCERNING THE MEANING OF WORDS. ONE OF THE MINOR RULES OF GRAMMAR IS THAT A QUALIFYING WORD OR PHRASE WILL BE DEEMED TO REFER TO ITS NEAREST ANTECEDENT UNLESS IT APPEARS TO REFER TO A MORE REMOTE ANTECEDENT. This is all very nice as long as one does not make too much of it.

As a helpful device, this grammatical usage has resolved occasional cases. *American Insurance Co. v. Been,* 232 Ky. 111, 22 S.W.2d 426 (1929); *Himes v. Masonic Mutual,* 215 Ala. 183, 110 So. 133 (1926); *Anderson v. State Farm,* 75 Cal.Rptr. 739 (1969); *Hardware Mutual Casualty Co. v. Curry,* 21 Ill.App.2d 343, 157 N.E.2d 793 (1959); *Peterson v. Sinclair Refining Co.,* 20 Wis.2d 576, 123 N.W.2d 479 (1963). Each one of these cases using the rule to resolve an ambiguity points out that the rule is only operative where a contrary intention of the parties is not apparent. Other cases have recognized the grammatical usage but have declined to apply it rigidly where a contrary result seemed indicated. *Reddi-Wip, Inc. v. Lemay Valve Co.,* 354 S.W.2d 913 (Mo. App., 1962); *Isaac T. Cook Co. v. Bank of St. Louis,* 297 S.W.2d 607 (Mo. App., 1957). Indeed, strong language is used by the United States Court of Appeals for the Tenth Circuit in declining to

apply the rule in *Hughes v. Samedan Oil Corp.*, 166 F. 2d 871, 873 (10th Cir. 1948):

"[N]either the rules of grammatical construction, nor any other rule should be indulged to confuse what is otherwise manifest or plain. Courts will not resort to grammatical niceties or the technicalities of punctuation in the interpretation and construction of an instrument unless they may be utilized to make plain that which is otherwise obscure [cites omitted]. We are primarily interested in giving effect to the intention of the parties, and not to the technical verbiage used to express it."

Indeed, the scales of justice in this case had sitting in the pan on Commercial Credit's side several weighty rules for construing ambiguities, long recognized in the jurisprudence of Maryland. One is to admit extrinsic evidence of the negotiations leading up to the formulation of a contract, of the circumstances of the parties at the time of entering into the contract and of the parties' own construction of the contract in order to discern their intention. *Canaras v. Lift Truck Services,* 272 Md. 337, 352, 322 A. 2d 866 (1974); *Mascaro v. Snelling & Snelling, supra; DWS Holdings, Inc. v. Hyatt Park Associates, Inc., supra.* Another is that an interpretation which is fair and reasonable will be preferred to one which leads to an unreasonable result. *Baltimore City v. Industrial Electric,* 230 Md. 224, 229, 186 A. 2d 469 (1962). Yet a third is that an ambiguous provision in a lease should be construed against the draftsman. *Burroughs Corporation v. Chesapeake Petroleum & Supply Co., Inc.,* 282 Md. 406, 411, 384 A. 2d 734 (1978); *Schuman v. Gordon Investment Corp.,* 247 Md. 265, 271, 232 A. 2d 256 (1967).

In short, Judge Grady, faced with an arguable ambiguity, resisted being caught in the coiled barbed wire of grammatical niceties, recognized the genuine and material dispute that existed, denied the Motion for Summary Judgment and moved on into the open arena of the trial where

546

evidentiary help was readily available. He is to be commended (and affirmed).

*Judgment affirmed; costs to be paid by appellant.*