742 A.2d 79

**PHILADELPHIA INDEMNITY INSURANCE CO.**

v.

**MARYLAND YACHT CLUB, INC. et al.**

**No. 79, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Dec. 10, 1999.

Scott O. Reed (Karen A. Reardon and Reardon, Golinkin & Reed, on the brief, Chicago, Illinois, Kurt D. Karsten, Curtis H. Booth and Cowdrey, Thompson & Karsten, P.A., Annapolis, on the brief), for appellant.

John B. Sinclair (Miles & Stockbridge P.C., on the brief), Towson, for appellees.

Argued before HOLLANDER, SONNER and JOHN F. McAULIFFE (Retired, Specially assigned), JJ.

HOLLANDER, Judge.

This appeal focuses on whether a bodily injury exclusion in a directors' and officers' ("D & O") liability insurance policy applied to a wrongful discharge action instituted against the insureds by a former employee who claimed he was fired from his job because of a work-related injury. Philadelphia Indemnity Insurance Company ("PIIC" or the "Insurer"), appellant, denied indemnity coverage and defense costs in connection with a wrongful discharge suit brought against Maryland Yacht Club, Inc. (the "Club") and three of its officers, Richard A. Weiss, Robin T. Barnes, and Bernard A. Fine, appellees. Dissatisfied with the Insurer's position, appellees initiated a declaratory judgment action against PIIC in the Circuit Court for Baltimore County, in which they also claimed breach of contract and negligence. After a motions hearing, judgment was entered in favor of appellees.

On appeal, PIIC presents four questions for our review, which we have condensed and reformulated as follows:

I.    Did the circuit court err in construing the bodily injury exclusion?

II. Did the circuit court ignore the "last antecedent" rule
   when it determined that the bodily injury exclusion did
   not preclude coverage in this matter?

For the reasons discussed below, we shall affirm.

## FACTUAL BACKGROUND

PIIC is a Pennsylvania-based insurer authorized to do
business in Maryland. The Club is a nonprofit corporation
that operates a navigating and sailing club in Pasadena. At
the relevant time, the individual appellees were officers of the
Club and members of the Club's Board of Governors[1] and
Executive Committee (collectively, the "Officers"). Article V,
§ 1 of the Club's Constitution and By–Laws states that "[t]he
affairs of the Corporation shall be managed by a Board of
Governors." Article VI, § 2 empowers the Executive Com-
mittee "to conduct the business of the Club between meetings
of the Board of Governors." Pursuant to Article VI, § 7, the
Executive Committee is also authorized to employ and dis-
charge the Club Manager. Article VI, § 1 dictates the Execu-
tive Committee's composition:

> There shall be an Executive Committee of the Board of
> Governors of the [Club] consisting of the Commodore as
> Chairman, the Treasurer, the Secretary and the Immediate
> Past Commodore, all serving as ex-officio voting members.
> The additional voting members shall be the Vice–Commo-
> dore, Director of Clubhouse Operations, Director of Yacht
> Basin Operations, the Director of Buildings, Grounds and
> Utilities, the Director of Food Services and the Communica-
> tions Coordinator.

Weiss served as the Commodore, Barnes was the Vice–
Commodore, and Fine held the position of Director of Club-
house Operations. Fine was also the Club's Insurance Chair-
man. It appears from the Constitution and By–Laws that the
Officers provided their services to the Club on a volunteer
basis.

---

1. The Club refers to its board of directors as a "Board of Governors."

On June 24, 1994, PIIC issued a "Non–Profit Directors and Officers Liability Insurance Policy" to the Club, Policy Number PHDO 101371 (the "Policy"). The Policy Declaration Page listed the Club as the "Named Insured" and its directors and officers as the "Insured." Thus, both the Club and the Officers were protected in accordance with the terms of the Policy, which ran from June 4, 1994 to June 4, 1995, and had a $2,000,000.00 limit of liability for each loss.[2] The Club made all required premium payments in a timely manner. The Policy stated, in relevant part:

### INSURING AGREEMENTS

I. COVERAGES A and B

    A. [PIIC] will pay on behalf of the Insured any Loss in an amount not exceeding the Limit of Liability in excess of the applicable Retention set forth in the Declarations which the Insured shall be legally obligated to pay as damages for any civil claim or claims first made against the Insured arising out of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by [PIIC] during the policy period.

    B. [PIIC] will pay on behalf of the Organization any Loss in an amount not exceeding the Limit of Liability in excess of the applicable Retention set forth in the Declarations which the Organization shall be legally obligated to pay as indemnification of any Insured with respect to any claim arising out of a Wrongful Act of any Insured when such claim is first made during the

---

**2.** The Policy was a "claims-made" policy, which expressly reserved coverage to "only those claims first made against the Insured during the policy period." Claims-made coverage is initiated when a claim is made against a policy holder, *not* when "the negligent or wrongful act took place or when the injury or damage was sustained." Eric Mills Holmes, *Holmes's Appleman on Insurance, 2d* § 16.4, at 315 (1998) (noting further that the purpose of such policies is the avoidance of "the hazards of an indefinite future since once the policy period has expired the books can be closed on everything except the then-existing claims").

▬▬▬▬▬▬▬▬
▬▬▬▬▬

policy period and written notice of said claim is received by [PIIC] during the policy period.

## II. DEFINITIONS

\* \* \*

B. "Organization" shall mean:

(1) the Parent Organization, and

(2) any Subsidiary of the Parent Organization.

C. "Insured" shall mean any person or persons who were, or are a director or officer of the Organization. . . .

\* \* \*

E. "Wrongful Act" shall mean any actual or alleged

1. act;

2. error;

3. omission;

4. misstatement;

5. misleading statements;

6. neglect or breach of duty;

not excluded hereunder, committed by one or more Insureds while acting within the scope and discharge of their duty(ies) with the Organization. . . .

F. "Loss" shall mean amounts paid by the Insured, or paid by the Organization but only with respect to Coverage B, which the Insured is legally liable to pay as damages, settlement of claims or in satisfaction of awards or judgments, including costs, charges and expenses, provided, however that Loss shall not include:

(1) punitive or exemplary damages or the multiple portion of any treble damages award; or

(2) criminal or civil fines or penalties imposed by law; or

(3) taxes; or

(4) matters deemed uninsurable under the law pursuant to which this Policy shall be construed.

\* \* \*

## CONDITIONS

\* \* \*

VI. NOTIFICATION

A. If during the Policy Period ... any Claim is made against any Insured, the Organization and the Insured shall, as a condition precedent to their rights for compensation under this Policy, give to [PIIC] notice in writing as soon as practicable of any such Claim, but in no event later than sixty (60) days after such Claim is first made.

B. If during the Policy Period ... the Insured or the Organization first become aware of a specific Wrongful Act, and if the Insured or the Organization shall, during such period, give written notice to [PIIC] as soon as practicable of:

(1) the specific Wrongful Act, and

(2) the consequences which have or may result therefrom, and

(3) the circumstances by which the insured or the Organization first became aware thereof;

then any Claim not otherwise excluded by the terms of this policy which is subsequently made against an Insured or Organization arising out of such Wrongful Act shall be deemed for the purpose of this Policy to have been made during the Policy Year in which such notice was first given.

It is undisputed that, under the Policy, the Club is the "Parent Organization" and the Officers are the "Insured." Various endorsements were executed and made a part of the Policy. One endorsement, the "Volunteers Endorsement," stated: "In consideration of the premium paid, it is agreed

that the Directors and Officers shall be deemed to include volunteers."

On May 20, 1994, Thomas E. Bock was discharged from his position as Club Manager. Thereafter, on October 24, 1994, Bock initiated suit against appellees for wrongful discharge, seeking compensatory relief and punitive damages of $4,000,-000.00. The following circumstances surrounding Bock's discharge are derived from his amended complaint, filed on January 5, 1995, and are relevant here.

Bock alleged that he sustained an injury to his leg during the course of his employment. Thereafter, he filed a claim with the Workers' Compensation Commission. Subsequently, he underwent several surgical procedures that were paid by the Club's workers' compensation insurance carrier. In the spring of 1994, appellees were allegedly advised that the Club's workers' compensation insurance premiums would increase substantially unless Bock were discharged. About the same time, Bock's attorney and the Club's workers' compensation insurer "became involved in a protracted argument over whether or not a vocational rehabilitation nurse could follow [Bock] around when he went to see his physicians." Bock's lawyer and Bock evidently refused to permit the nurse to do so. Bock alleged that the Officers subsequently held a meeting and decided to terminate his employment "solely because of his filing for workers [sic] compensation benefits and the expenses associated with the claim."

On or about November 17, 1994, appellees notified PIIC of Bock's wrongful discharge suit, in order to activate coverage under the Policy. By letter dated December 13, 1994, PIIC denied coverage for the suit. Although PIIC cited a number of Policy provisions in its letter, the only one material here is § III(A)(2), which states:

III. EXCLUSIONS

A. [PIIC] shall not be liable to make payment for Loss in connection with any claim against any Insured or Organization, *arising out of, directly or indirectly re-*

*sulting from or in consequence of, or in any way involving:*

\* \* \*

(2) *Any actual or alleged bodily injury,* sickness, disease or death of any person, or any actual or alleged damage to or destruction of any tangible property including loss of use thereof, or any actual or alleged invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, assault, battery, mental anguish, emotional distress, or loss of consortium.

(Emphasis added).

On March 20, 1995, following the Insurer's denial of coverage under the Policy, appellees initiated suit against PIIC. They sought a declaratory judgment with respect to the parties' rights and responsibilities under the Policy, and alleged breach of contract and negligence. In their complaint, appellees asserted that PIIC wrongfully "refused to acknowledge coverage for the claims under the Policy, refused to indemnify [them] for any judgment or settlement, refused to defend the lawsuit, and refused to pay [them] their costs and expenses incurred in the defense of the lawsuit." In October 1995, while appellees' suit was pending, appellees settled Bock's suit for a lump sum payment of $15,000, without PIIC's assistance.

On March 23, 1998, PIIC filed its answer.[3] Subsequently, it filed a motion for summary judgment on April 17, 1998, averring that appellees' claim was not covered under the Policy. Appellees filed their motion for partial summary judgment on May 4, 1998, seeking attorneys' fees, costs, and expenses incurred in defending Bock's suit, and a declaratory judgment as to PIIC's liability.

---

**3.** It is unclear from the record why the answer was filed three years after the complaint was lodged.

A hearing was held on the parties' summary judgment motions on July 27, 1998. In its opinion and order filed on August 27, 1998, the court stated, in part:

> PIIC contends that Bock's wrongful discharge claim arose out of the injury to his leg and therefore is excluded from coverage.... PIIC argues that the broad judicial interpretation given ... to the phrase "arising out of," as used in liability insurance policies, compels the conclusion that because Bock's wrongful discharge claim was premised upon his termination for having sought benefits for a leg injury, it is encompassed in the personal injury exclusion under the Policy.

> \* \* \*

> [T]he loss for which Bock sought recovery in his wrongful discharge action against [the Club] was not the personal injury that he had sustained to his leg. (In fact, the exclusive bar of the Worker's Compensation Act would have prohibited him from suing [the Club] to recover damages for his leg injury.) Rather, the loss for which Bock was seeking damages was the loss of his job. That loss did not "arise out of" Bock's leg injury in the causal sense in which the Court of Appeals interpreted the phrase in *Northern Assurance* [*Co. v. EDP Floors,* 311 Md. 217, 533 A.2d 682 (1987) ]. The natural consequence of Bock's leg injury was not [the Club's] wrongful act in terminating him; nor did the wrongful discharge "flow from. .[sic] originat[e] from, [or] grow[ ] out of" the leg injury. [*Id.* at 230, 533 A.2d 682.] Bock's claim for worker's compensation benefits for his leg injury was the improper motive for his termination, not its cause.

(Sixth, seventh, and eighth alterations in original).

Accordingly, the court denied appellant's motion for summary judgment and granted appellees' motion for partial summary judgment. Thereafter, the parties stipulated to damages in the amount of $74,934.35. Consequently, on Feb-

ruary 18, 1999, the circuit court entered a final judgment in that amount in favor of appellees.

We will include additional facts in our discussion.

## STANDARD OF REVIEW

Maryland Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Regional Med. Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see* Md. Rule 2–501(e); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Kramer v. Mayor of Baltimore*, 124 Md.App. 616, 622–23, 723 A.2d 529, *cert. denied*, 354 Md. 114, 729 A.2d 405 (1999). In reviewing the circuit court's grant of summary judgment, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998).

To defeat a motion for summary judgment, the party opposing the motion must produce evidence demonstrating that the parties genuinely dispute a material fact. *Scroggins v. Dahne*, 335 Md. 688, 690–91, 645 A.2d 1160 (1994); *Fick v. Perpetual Title Co.*, 115 Md.App. 524, 533, 694 A.2d 138, *cert. denied*, 347 Md. 153, 699 A.2d 1168 (1997). A material fact is one that will alter the outcome of the case depending upon how the factfinder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Keesling v. State*, 288 Md. 579, 583, 420 A.2d 261 (1980). In opposing the motion, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision." *Beatty*, 330 Md. at 738, 625 A.2d 1005. But, the court views the facts, and all reasonable inferences drawn from the facts, in the light most favorable to the non-moving party. *Berkey v. Delia*, 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Maloney v. Carling*

*Nat'l Breweries, Inc.,* 52 Md.App. 556, 560, 451 A.2d 343 (1982).

If the parties do not dispute any material facts, the court may resolve the case as a matter of law. *See* Md. Rule 2–501(e). In reviewing the trial court's decision, we must determine whether the court reached the correct legal result. *Beatty,* 330 Md. at 737, 625 A.2d 1005. Furthermore, we generally review an award of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995).

## DISCUSSION

### I.

■ As the language of § III(A)(2) is the focus of the dispute, we begin by restating it here for convenience:

III. EXCLUSIONS

    A. [PIIC] shall not be liable to make payment for Loss in connection with any claim against any Insured or Organization, *arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:*

         \* \* \*

    (2) *Any actual or alleged bodily injury,* sickness, disease or death of any person, or any actual or alleged damage to or destruction of any tangible property including loss of use thereof, or any actual or alleged invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, assault, battery, mental anguish, emotional distress, or loss of consortium.

(Emphasis added).

Appellant complains that the circuit court erred by failing to conclude that the bodily injury exclusion applied to the wrongful discharge suit lodged by Bock against appellees, so as to preclude coverage under the Policy. The Insurer maintains

that Maryland courts have given the phrase "arising out of" a broad interpretation. Thus, PIIC contends that because Bock's wrongful discharge suit "arises out of" Bock's bodily injury claim, Bock's wrongful discharge suit is within the ambit of the bodily injury exclusion. Further, appellant avers that the lower court erred by failing to give effect to the remainder of the introductory language in the bodily injury clause, which stated: "directly or indirectly resulting from or in consequence of, or in any way involving."

Appellees counter that PIIC's contentions "lead this court on an esoteric and metaphysical journey that is unduly confusing and complicated in its approach to the simple question posed by this case." They assert, *inter alia,* that the purpose of including a bodily injury exclusion in a D & O policy would not be served by denying coverage in this case. Alternatively, appellees posit that the exclusion is ambiguous and, accordingly, it should be construed in their favor.

■ We begin with a review of the applicable principles that govern the construction of insurance policies. "Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021 (1993); *see Nationwide Ins. Cos. v. Rhodes,* 127 Md.App. 231, 236, 732 A.2d 388 (1999); *Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co.,* 113 Md.App. 540, 554, 688 A.2d 496 (1997). Rather, the interpretation of an insurance policy is guided by the same principles that apply to the construction of other contracts. *Rhodes,* 127 Md.App. at 236, 732 A.2d 388; *Baltimore Gas & Elec.,* 113 Md.App. at 553, 688 A.2d 496.

■ The goal in construing a contract is to ascertain and effectuate the intention of the contracting parties, unless that intention is at odds with an established principle of law. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). "The primary source for determining the intention of the parties is the

language of the contract itself." *Id.* at 291, 674 A.2d 106. Therefore, "[i]n construing insurance contracts in Maryland we give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the instrument as a whole." *Finci v. American Cas. Co.,* 323 Md. 358, 369–70, 593 A.2d 1069 (1991). Moreover, "[a] contract must be construed as a whole, and effect given to every clause and phrase, so as not to omit an important part of the agreement." *Baltimore Gas & Elec.,* 113 Md.App. at 554, 688 A.2d 496; *see Bausch & Lomb,* 330 Md. at 779, 625 A.2d 1021.

Ordinarily, the clear and unambiguous language of a written agreement controls, even if the expression is not congruent with the parties' intent at the time of the document's creation. *See Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 435–36, 727 A.2d 358 (1999); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298 (1996); *Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 63, 706 A.2d 124 (1998); *Baltimore Gas & Elec.,* 113 Md.App. at 554, 688 A.2d 496. Whether a contract is ambiguous is a question of law. *Ashton,* 354 Md. at 341, 731 A.2d 441; *Calomiris,* 353 Md. at 434, 727 A.2d 358. Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris,* 353 Md. at 436, 727 A.2d 358; *accord Ashton,* 354 at 340, 731 A.2d 441; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 596, 578 A.2d 1202 (1990); *see Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 389, 488 A.2d 486 (1985).

Appellant asserts that in Maryland the phrase "arising out of" has a settled meaning that bars coverage under the Policy for Bock's wrongful discharge suit. Relying on *Mass Transit Admin. v. CSX Transp., Inc.,* 349 Md. 299, 708 A.2d 298 (1998), appellant posits that the circuit court erroneously applied "last act" causation and a "sole cause" analysis. Instead, appellant contends that the trial court should have applied "but for" causation. Appellant states: "[T]his Court

*must* ask whether 'but for' Bock's injury, could he have been wrongfully terminated for filing a workers' compensation claim?" Appellant's reliance on *CSX* is unavailing.

To be sure, the phrase "arising out of" is used frequently in insurance contracts, and has been the subject of prior interpretation by Maryland courts. *See CSX Transp.,* 349 Md. 299, 708 A.2d 298, and cases cited therein. Nevertheless, it does not have a single, "settled meaning" that applies to every insurance policy. Contractual language cannot be construed in a vacuum. *See Finci,* 323 Md. at 369–70, 593 A.2d 1069. Thus, language used in one contract may carry a different meaning in another; we construe such phrases "on a contract by contract or case by case basis, and not by sweeping language saying that regardless of the exact provisions of the contract we shall interpret all similar, but not identical, contracts alike." *National Grange Mut. Ins. Co. v. Pinkney,* 284 Md. 694, 706, 399 A.2d 877 (1979) (discussing construction of omnibus clause in motor vehicle liability policy).

*CSX Transp., supra,* 349 Md. 299, 708 A.2d 298, on which appellant relies, is noteworthy. CSX Transportation ("CSXT") was under contract to the Mass Transit Administration of the Maryland Department of Transportation ("MTA") to provide commuter rail service. The contract's indemnity provision stated, in part:

"(a) CSXT will provide regularly scheduled daily commuter rail service. . . . This train operation, plus the maintenance of equipment, access of and use of facilities, ticket sales, and other activities required to support the operation of the train service as provided in this Article I, shall be called the 'Contract Service.' CSXT will make available its rail facilities on the above stated lines to provide the Contract Service. CSXT will operate the Contract Service in a safe and efficient manner with use of appropriate facilities and staff for management, train operations, and maintenance. . . .

* * *

(b) Indemnification by [MTA]

(1) [MTA] agrees to indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind *arising out of* the Contract Service under this Agreement. . . .

(2) CSXT will promptly advise [MTA] of pending claims for which [MTA] is responsible under subsection (b)(1) with estimates of settlement costs in each instance. Any proposed settlement or payment in excess of Ten Thousand Dollars ($10,000) will be submitted to [MTA] for prior approval."

*CSX Transp.,* 349 Md. at 301–02, 708 A.2d 298 (quoting Commuter Rail Passenger Service Agreement) (first and third omissions not in original) (footnote omitted).

CSXT hired a contractor to pave several of its public road crossings. The contractor left his backhoe on the tracks as a commuter train approached. The train struck and destroyed the backhoe. Because the central dispatcher was not advised of the work, he was unable to warn the train's engineer. The contractor subsequently brought suit against CSXT for damages to the backhoe. CSXT and the contractor settled the action and CSXT sought indemnification from MTA. When MTA refused, CSXT filed suit.

On appeal, CSXT averred that the train operation constituted "Contract Service," and that the contractor's claim against it "arose out of" Contract Service because the train was the direct and immediate physical cause of the damage to the backhoe—a "but for" analysis. *Id.* at 307, 708 A.2d 298. The MTA contended that CSXT's negligence "further back in the chain of causation, caused the accident, either by failure to warn the backhoe operator, failure to warn the oncoming MARC train, or failure to alert the dispatcher that the work on the crossing was being done"—a proximate or sole cause analysis. *Id.* at 312, 708 A.2d 298.

In interpreting the contractual indemnification, the Court relied on its decision in *Northern Assurance Co. of Am. v. EDP Floors, Inc.,* 311 Md. 217, 533 A.2d 682 (1987). There,

an employee of a customer of EDP Floors was injured while assisting with the unloading of an EDP Floors truck. The employee filed suit against EDP Floors, alleging vicarious liability for the agent's negligence and direct liability for negligent hiring, retention, and supervision. *EDP Floors*, 311 Md. at 220, 533 A.2d 682. The Court was asked to review an exclusion in a general business liability policy for " 'bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any automobile.' " *Id.* at 224–25, 533 A.2d 682 (emphasis omitted). The *Northern Assurance* Court concluded that there was no coverage. It stated, and *CSX* quotes in full:

> "The words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like. While these words plainly import a causal relation of some kind, read in context, they do not require that the unloading of the truck be the sole 'arising out of' cause of the injury; they require only that the injury arise out of the unloading of the vehicle. Therefore, if [claimant's] bodily injury arose out of EDP's employee's unloading of the truck, then that injury is excluded from coverage. This is so regardless of whether the injury may also be said to have arisen out of other causes further back in the sequence of events, such as the employee's consumption of alcohol, or the employer's negligent failure to supervise the employee. The exclusion also applies irrespective of the theory of liability by which [claimant] seeks redress for his injury, as the policy exclusion is not concerned with theories of liability. Rather, the policy insures against certain types of damages or injuries, specifically excluding injuries arising out of the operation, use or unloading of EDP's vehicle.
>
> As we see it, the language in the exclusionary clause clearly focuses the 'arising out of' inquiry on the instrumentality of the injury, *i.e.*, upon the truck and its unloading. When, as here, there is no ambiguity in the policy exclusion, the first principle of construction of insurance policies in Maryland requires that we apply the terms of the contract as written. To apply either a proximate or concurrent

cause analysis in the interpretation of the policy exclusion, as EDP urges, would severely strain its plain import and would result in coverage being provided, contrary to the intention of the parties, for acts inseparably associated with the operation, use or unloading of the truck."

*CSX Transp.*, 349 Md. at 311–12, 708 A.2d 298 (quoting *EDP Floors*, 311 Md. at 230–31, 533 A.2d 682).

The *CSX* Court subsequently addressed the MTA's sole cause analysis by stating that the failures to warn the backhoe operator, commuter train, and dispatcher "do not diminish the fact that the damage to the backhoe arose out of the collision with the [commuter] train, just as the insured's negligence in *EDP Floors* in allowing the helper to go out on the delivery truck did not diminish the fact that the personal injuries in that case arose out of unloading the truck." *Id.* at 312, 708 A.2d 298. The *CSX* Court also referred to a number of other liability insurance cases. *See, e.g., Chesapeake & Potomac Tel. Co. v. Allegheny Constr. Co.*, 340 F.Supp. 734 (D.Md.1972) (reviewing a manufacturer's and contractor's policy); *Frazier v. Unsatisfied Claim & Judgment Fund Bd.*, 262 Md. 115, 277 A.2d 57 (1971) (reviewing a State fund with language parallel to a common automobile policy); *National Indem. Co. v. Ewing*, 235 Md. 145, 200 A.2d 680 (1964) (reviewing an automobile policy); *Schmidt v. Utilities Ins. Co.*, 353 Mo. 213, 182 S.W.2d 181 (1944) (reviewing an automobile policy). Upon review of these cases, and the facts before it, a majority of the Court concluded that "so long as the liability of CSXT arises out of Contract Service, it matters not that MTA is without fault." *CSX Transp.*, 349 Md. at 317, 708 A.2d 298. In other words, the Court equated the phrase "arise out of" in the CSXT–MTA agreement to "but for" causation. "But for" the commuter train colliding with the backhoe, the backhoe would not have been damaged.

As we see it, appellant has latched onto a phrase from *CSX* and contends that, because the Court of Appeals addressed that same phrase in *CSX*, we must apply the same construction to the Policy at issue here. In doing so, appellant ignores cardinal principles of contract construction that are founded

on common sense. Moreover, the disputed contract in *CSX* was not a D & O liability insurance policy. Indeed, it was not even an insurance policy. Rather, it was a service contract that contained an indemnity clause, which "was intended ... to serve as liability insurance for CSXT." *Id.* at 310, 708 A.2d 298. Thus, in the context of this case, we are satisfied that the bodily injury exclusion is not ambiguous; a reasonable person in the position of the parties could not conclude that the bodily injury exclusion applied to the facts attendant here. Indeed, only a tortured construction of the exclusion—one that ignores common sense—would lead to the result urged by appellant.

Two of our recent decisions demonstrate the weakness of appellant's proposed interpretation. *See Webster v. Government Employees Ins. Co.*, 130 Md.App. 59, 744 A.2d 578 (1999); *Wright v. Allstate Ins. Co.*, 128 Md.App. 694, 740 A.2d 50 (1999). We turn to review these cases.

In *Webster,* the parents of Catherine Webster, a slain carjacking victim, brought suit against their own automobile insurance company, Government Employees Insurance Company ("GEICO"), to recover uninsured motorist benefits. Ms. Webster was killed when the driver of the vehicle in which she was a passenger tried to escape an attempted carjacking by accelerating away from the assailant, who was outside of the vehicle. In response, the assailant shot Ms. Webster in the head.

GEICO's policy provided coverage for " 'damages for bodily injury and property damage caused by accident which the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle arising out of the ownership, maintenance or use of that vehicle.' " *Webster,* 130 Md.App. at 62, 744 A.2d 580 (emphasis omitted). The victim's parents argued, *inter alia,* that they were entitled to recover under their policy because the phrase, "arising out of the ownership, maintenance, or use of the uninsured motor vehicle," included an attempted carjacking. We rejected such a broad interpretation, stating, in part, that "Webster's injuries

were not causally connected to the use of an uninsured vehicle, but rather were caused by [the carjacker's] assault." *Id.,* at 66, 744 A.2d 578. In reaching our decision, we relied on numerous cases from other jurisdictions, including *Huston v. State Farm Mut. Auto. Ins. Co.,* 99 F.3d 132 (4th Cir.1996). That case recognized that injuries resulting from a carjacking do not arise from use of the vehicle.

In *Webster,* we also considered our decision in *Wright,* which involved an assault on motorists. There, a man got out of his car, approached a vehicle that had stopped at a stop sign, and began firing into the passenger compartment, injuring the driver and a passenger. The assailant then returned to his car and drove away. The victims filed suit against their automobile insurance company, Allstate Insurance Company ("Allstate"), for uninsured motorist coverage. Under the Allstate policy, the insurer agreed to " 'pay damages for bodily injury[,] sickness, disease or death, or property damage which an insured person is legally entitled to recover from the owner or operator of an uninsured auto. Injury must be caused by accident and *arise out of* the ownership, maintenance or use of an uninsured auto.' " *Wright,* 128 Md.App. at 696, 740 A.2d 50 (emphasis added). The Court determined that the victims were not covered under the policy. We reasoned that the victims

> were injured because [the assailant] shot them, not because he was using a car. . . . We agree that the use of the car was incidental to the attempt to kill [the driver]. It was not directly, causally, connected to the incident.
>
> Were we to hold otherwise . . ., any victim of a crime whose assailant fled the scene of a crime in a car could seek recovery from his own insurer if he had a policy containing uninsured motorists coverage. Uninsured motorists coverage was never intended to cover the type of injuries presented by the facts of this case.

*Id.,* 128 Md.App. at 698–99, 740 A.2d 50.

Here, as in *Wright* and *Webster,* common sense compels the conclusion that the bodily injury exclusion did not bar coverage for Bock's wrongful termination claim. We are equally

unpersuaded by appellant's argument that the trial court failed to give effect to the remaining words of the clause introducing the exclusions ("directly or indirectly resulting from or in consequence of, or in any way involving").

Even if, *arguendo*, the bodily injury exclusion were ambiguous, the Insurer would fare no better.[4] In analyzing the issues presented here, we are mindful of the general purpose that a D & O policy serves. The demand for D & O insurance has its origins in basic corporate law. A board of directors is charged with managing the "business and affairs" of its corporation. Md.Code (1975, 1993 Repl.Vol., 1999 Supp.), § 2–401(a) of the Corporations & Associations Article ("C.A."). The officers designated by the board are the day-to-day managers. *See id.* § 2–414(a); James J. Hanks, Jr., *Maryland Corporation Law* § 6.19, at 194–95 (Supp.1996–2). These principles apply to both for-profit and nonprofit corporations.

> The Club was incorporated under the laws of Maryland to encourage and promote YACHTING as well as all other related sports; the science of navigation and seamanship; safety at sea; the more extensive use of our waters and shores as well as any improvements thereto; and to provide and maintain suitable facilities for the recreation of its members and the mooring of their yachts.

One of the benefits of incorporation is the concurrent acquisition of a judicially and legislatively developed body of corporate law.[5]

---

**4.** Appellant argues in its reply brief that if we find the bodily injury exclusion ambiguous, then we should "remand the matter to the Circuit Court to give PIIC the opportunity to submit extrinsic evidence in support of its construction of the exclusion." *See JMP Assocs. v. St. Paul Fire & Marine Ins. Co.,* 345 Md. 630, 648, 693 A.2d 832 (1997). It maintains that extrinsic evidence would support its position as to the parties' intent. At oral argument, appellees countered that a remand is not warranted, because appellant had the opportunity to present extrinsic evidence. We agree with appellees that appellant was not precluded below from presenting extrinsic evidence as to the parties' intent.

**5.** Most nonprofit organizations that incorporate in Maryland do so as nonstock corporations. William M. Davidow, Jr., *Formation and Gover-*

Maryland has not adopted a separate statutory framework to control the incorporation of nonprofit organizations. *But see, e.g.*, D.C.Code Ann. §§ 29–501 to –599.16 (1996 & Supp. 1999); N.J. Stat. Ann. §§ 15A:1–1 to 15A:16–2 (West 1984 & Supp.1999); N.Y. Not–for–Profit Corp. Law §§ 101–1516 (McKinney 1997 & Supp.1999). Although there are certain exceptions for special limited-use entities, the Corporations and Associations Article does not refer to nonprofit corporations. Davidow, *supra*, at 369 & n. 1; *see* C.A. §§ 5–526, 5–5A–07, 5–5A–24, 5–601, 5–602. Because officers of a corporation subject themselves to the risk of litigation when performing their duties, Maryland allows, and sometimes mandates, corporate indemnification. *See* C.A. § 2–418(j). To diffuse the economic risk associated with indemnification, "[a] corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the corporation . . . against any liability asserted against and incurred by such person in any such capacity or arising out of such person's position." *Id.* § 2–418(k)(1). *See generally* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 131:31, at 131–36 (1997) (stating that D & O "coverage mirrors other professional liability insurance in that it is designed to protect corporate officials from loss in the event of a claim made against them in their official capacities").[6]

_____

nance of "Not For Profit" Organizations, in Not–For–Profit Organizations 1993, at 370–71 (MICPEL 1993); *see* C.A. §§ 5–201 to –209 (governing nonstock corporations). *See generally* Stewart P. Hoover, Comment, *Nonprofit Corporations and Maryland's Director and Officer Liability Statute: A Study of the Mechanic's of Maryland's Statutory Corporate Law*, 18 U. Balt. L.Rev. 384 (1989). Unless a contrary intention is shown, the Maryland General Corporation Law, C.A. tits. 1–3, applies to nonstock corporations. C.A. § 5–201.

**6.** Corporate officers may also seek personal liability protection under the Courts and Judicial Proceedings Article. "In 1986 the General Assembly took steps to protect the directors and officers of nonprofit organizations, many of whom served for little or no compensation, from liability. That is, [C.J. §§ 5–406, 5–407, and 5–802] provide limitations on the personal liability of individuals performing services for tax-exempt organizations under certain conditions." Davidow, *supra*, at 382; *see Abramson v. Reiss*, 334 Md. 193, 208, 638 A.2d 743 (1994)

Significantly, in its promotional literature, appellant expressly represented: "Coverages included in the standard policy are: ... Wrongful Termination...." PIIC also indicated in its literature that its D & O liability insurance for non-profits "[f]ulfills social responsibility to the board members and other employees" and "[a]ttracts qualified board members and employees by providing excellent coverage benefits." The Policy did not deviate from the industry standard. These kinds of policies generally "cover[ ] both (1) directors and officers directly for any loss incurred by them in suits by the corporation, stockholder or third parties and (2) the corporation for any indemnification paid by it to directors or officers." Hanks, *supra,* § 6.21[m], at 216 (citing *Continental Cas. Co. v. Board of Educ.,* 302 Md. 516, 529–30, 489 A.2d 536 (1985)); *see* 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1344.10, at 103 (perm. ed. rev.vol.Supp.1998); Joseph P. Monteleone & Nicholas J. Conca, *Directors and Officers Indemnification and Liability Insurance: An Overview of Legal and Practical Issues,* 51 Bus. Law. 573, 587–88 (1996) (*"Overview"*).

Similarly, the Policy covers such contingencies in its Insuring Agreements. Coverage A states: "[PIIC] will pay on behalf of the [Officers] any Loss ... which the [Officers] shall be legally obligated to pay as damages for any civil claim or claims first made against the Insured arising out of a Wrongful Act...." Coverage B provides: "[PIIC] will pay on behalf of the [Club] any Loss ... which the [Club] shall be legally obligated to pay as indemnification of any [Officer] with respect to any claim arising out of a Wrongful Act of any [Officer]...."

Certainly, D & O insurance does not necessarily cover every liability; exclusions may be used to limit coverage. *See* Fletcher, *supra,* § 1344.10, at 103 ("A claim is covered unless the exclusions clearly provide otherwise."). "There are two broad categories of [D & O] policy exclusions; those related to

(discussing C.J. §§ 5–312 and 5–314) (now C.J. §§ 5–406 and 5–407, respectively).

corporate governance and those related to matters that should be covered by other liability insurance." Russ & Segalla, *supra*, § 131:33, at 131–39; *accord Overview, supra*, at 600. Bodily injury exclusions clearly fall into the latter category.[7] In its exclusions, the Insurer easily could have included a provision expressly barring coverage for wrongful termination claims. Were we to adopt appellant's reasoning, appellees would not have obtained the bargained-for insurance coverage that they purchased.[8] Indeed, it would mean that some wrongful discharge claims would be covered, while others would not be covered, making coverage determinations rather unwieldy.

---

**7.** At the time the *Overview* was published, the authors served as counsel for an insurance company, Reliance National. They undertook a review of Reliance National's D & O liability policy. Parts of the policy were embedded throughout the *Overview;* the form and substance of the Reliance National contract were substantially similar to the corresponding parts of the Policy here. *Overview, supra,* at 587–607. As part of their policy analysis, the authors addressed specific policy exclusions. One such exclusion was " 'for any Personal Injury, bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof.' " *Id.* at 604 (emphasis omitted). The associated commentary stated that this exclusion "excludes from coverage matters that are *generally covered under the corporation's comprehensive or commercial general liability policies." Id.* (emphasis added).

**8.** Perhaps a hypothetical will best illustrate the fallacy in appellant's construction of the Policy. Assume that John Doe began drinking at an early age. By eighteen, Doe was diagnosed as an alcoholic and was later hospitalized, where he was successfully treated for alcoholism. By the age of twenty-three, Doe had been sober for five years, but attended Alcoholics Anonymous ("AA") meetings as a precaution. He had also been the Club Manager for one year. A member of the Club saw Doe leaving one of his AA meetings and informed the Executive Committee. A Club Officer approached Doe and asked him if he is an alcoholic. Doe answers that he once was. Fearing that the membership might look negatively upon an alcoholic Club Manager, the Executive Committee terminates Doe. Consequently, Doe sues appellees for wrongful discharge. Under appellant's analysis, appellees would not be covered under the Policy for Doe's wrongful discharge claim, because Doe's termination arises out of, results from, and/or involves the disease of alcoholism, and the Policy precludes coverage for claims arising out of bodily injury, sickness, or disease. In our view, the Policy does not permit such an absurd result.

We conclude that the Insurer's construction of the Policy distorts its clear import. Although the Policy excluded coverage for bodily injury claims, the Policy does not bar coverage for the wrongful termination suit instituted by Bock against appellees. Simply put, the nexus between Bock's wrongful discharge action and his bodily injury claim is too attenuated to permit the insurer to invoke the bodily injury exclusion.

## II.

Notwithstanding its other arguments, appellant contends that the circuit court ignored the "last antecedent" rule when it rejected the bodily injury exclusion. The last antecedent rule provides that "a relative or qualifying word, phrase, or clause will be construed as referring to its nearest antecedent." 17A C.J.S. *Contracts* § 305 (1963). Maryland never adopted this rule of construction. *See Stanbalt Realty Co. v. Commercial Credit Corp.*, 42 Md.App. 538, 539, 401 A.2d 1043 (1979); *see also id.* at 544, 401 A.2d 1043 (" 'The "last antecedent" rule is merely an aid to construction and will not be adhered to where remote antecedent is clearly intended.' " (quoting 17A C.J.S. *Contracts* § 305 n.73)). Thus, although

> the court, in construing a contract, will not ignore the rules of grammar and the grammatical construction of the language used, the grammatical construction will not be followed if a different construction will better give effect to the intention of the parties as shown by the whole instrument and the circumstances. . . .

17A C.J.S. *Contracts* § 305 (footnote omitted); *see Stanbalt Realty*, 42 Md.App. at 543, 401 A.2d 1043.

Judge Moylan aptly summarized the doctrine's usefulness in writing for this Court in *Stanbalt Realty*. There, he said: "Grammar is one helpful tool, among many, for discerning the meaning of words. One of the minor rules of grammar is that a qualifying word or phrase will be deemed to refer to its nearest antecedent unless it appears to refer to a more remote antecedent." 42 Md.App. at 544, 401 A.2d 1043 (emphasis omitted).

Although we have rejected the "title" appellant attached to its argument, we will not neglect its "theme." Appellant contends that the trial court impermissibly focused on the nature of the "loss" instead of the nature of the "claim," and failed to give meaning to the phrase "in connection with any claim."

The Policy insures appellees against "Loss." *See generally Finci,* 323 Md. at 370, 593 A.2d 1069 (discussing "Loss" in D & O policy). As defined in the Policy, a "Loss" is a legal liability to pay money. The liability to pay stems from a "Wrongful Act" by an "Insured." Coverage A provides that PIIC will pay any Loss on the Officers' behalf. In this context, a "Loss" includes payments to settle claims or satisfy judgments. It also includes the payment of reasonable legal fees and expenses incurred in the defense. Coverage B provides that PIIC will pay the Club any Loss it suffers associated with legally mandated indemnification. A "Claim" is "a demand for money, services or any judicial or administrative proceeding" brought against the Officers or the Club.

The trial court did not, as appellant contends, ignore the phrase "in connection with claims," which language appears in the exclusion's introduction. Indeed, the lower court was clearly cognizant of the Policy's terms. In its opinion, the court stated: "[T]he loss for which Bock sought recovery in his wrongful discharge action against [the Club] was not the personal injury that he sustained to his leg.... Rather, the loss for which Bock was seeking damages was the loss of his job." Arguably, it would have been clearer if the court had used the word "claim" in its analysis, rather than the term "loss." The court's meaning was nonetheless evident, and we will not allow semantics to invalidate the court's well-reasoned opinion. A slight rephrasing would result in the following: "The claim Bock initiated against the Club was not a personal injury claim. Rather, the claim was for wrongful discharge."

In sum, the result in this case was legally correct. Therefore, we shall affirm.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.