### ARKANSAS FUEL OIL CO. v. KIRKMYER et al.

### No. 5497.

Circuit Court of Appeals, Fourth Circuit.
Jan. 6, 1947.
Writ of Certiorari Denied April 7, 1947.

Robert Roberts, Jr., of Shreveport, La. (R. Grayson Dashiell, of Richmond, Va., and H. C. Walker, Jr., of Shreveport, La., on the brief), for appellant.

Ralph T. Catterall, of Richmond, Va., (T. Nelson Parker, Alexander W. Neal, Jr., and Guy B. Hazelgrove, all of Richmond, Va., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in an action instituted by the Arkansas Fuel Oil Company, hereafter referred to as Arkansas, against Lacy D. Kirkmyer and others, a partnership trading as James River Oil Company, hereafter referred to as James River. The action sought recovery of $40,428.07 for oil and gasoline sold and delivered by Arkansas to James River between March 10 and November 2, 1943. Liability was admitted in the sum of $8,056.53 for petroleum products other than gasoline, but was denied as to the remainder of the claim on the ground that it represented sales and deliveries of gasoline at prices in excess of the ceiling price as established by regulations of the Office of Price Administration. It was the contention of James River that the sales and deliveries were made pursuant to contracts which were criminal under the laws of the United States because violative of the regulations, and that Arkansas was not entitled to recover anything either under the contracts themselves or because of the deliveries. The facts, which were not in dispute, were established by the pleadings and affidavits filed in support of motions for summary judgment. The trial court held with the contention of James River and gave summary judgment for the admitted liability of $8,056.53, and Arkansas has appealed.

Arkansas is a producer of crude petroleum with office and refinery in the State of Louisiana. James River is an independent jobber of petroleum products in Virginia. Under a contract, dated November 10, 1939, Arkansas sold and delivered to James River gasoline and kerosene which were transported to Norfolk by water carrier and delivered at ship's rail to an ocean terminal which James River operated in Norfolk harbor. Prices for gasoline under this contract were based on the prevailing tank wagon prices to service station dealers in the area served by James River, with a deduction designed to compensate James River for the service rendered by it including the use of its ocean terminal. The allowance was intended to give James River a price of ½ cent per gallon below published terminal prices at Norfolk, James River being allowed ¼ cent per gallon for the use of its terminal and a like amount for brokerage. The contract was to run for five years, but provision was made that either party might terminate it by giving 275 days notice.

By the summer of 1941, gasoline prices on the Gulf Coast had advanced materially but there was no corresponding increase in tank wagon prices in Virginia upon which the prices received by Arkansas were based. Negotiations to revise the contract were not successful; and in July 1941 Arkansas gave notice that it would be terminated on May 8, 1942. On March 12th, 1942, a new contract was signed to become effective on May 8th, and in the meantime deliveries under the old contract were continued. The new contract excused any failure to make delivery due to inability to secure ocean transportation and provided that the price should be that announced by Arkansas on the date of the withdrawal from storage, with option on the part of James River to purchase at a price ½ cent below the Norfolk terminal price as published in a current issue of a trade publication.

The price announced by Arkansas under the new contract was considerably above that charged for deliveries during the 60 day period preceding October 15, 1941; and James River made protest to the OPA contending that the latter constituted the ceiling price under OPA regulations. Assistant General Counsel of the OPA took the matter up with Arkansas and ultimately sustained the contention of James River in a letter interpreting the regulation to which we shall refer hereafter and holding that Arkansas' ceiling price to James River could not be established under subsection (b) (1) thereof. In the meantime, it had become impossible to secure ocean transportation for oil and gasoline. Arkansas thereupon notified James River that it would no longer make deliveries in Norfolk and between July 1942 and March 1943, sales were made f.o.b. tank cars at refineries in Louisiana. James River protested the prices charged for these deliveries and withheld $17,000 of the amount

due for them, but, upon the recommendation of OPA, ultimately paid the full amount claimed by Arkansas. The parties then entered into a new agreement under which were made the sales and deliveries which are the subject of this action.

This new agreement was made after government orders prevented James River bringing its gasoline by tank cars to Virginia, and after both parties had been urged by the public authorities to settle their controversy. Under the agreement, Arkansas purchased gasoline from another refiner, the Gulf Oil Company, and deliveries thereof were made by Gulf to James River in Norfolk and Richmond (the greater part being made in Norfolk), f.o.b. trucks and barges at Gulf's terminals. In March the Norfolk price was fixed at $.07816 per gallon and on May 5th this was raised to $.0795 per gallon. Both prices were less than the prices actually paid to Gulf by Arkansas for the gasoline delivered to James River.

The contention of Arkansas is that the prices charged James River were less than ceiling prices when properly computed under the applicable regulation; and we think that this position is clearly correct. The regulation applicable to the Norfolk sales is Price Schedule No. 88, Appendix A, subsection (b) (1), which is as follows:

"(1) The maximum price on each product sold, contracted to be sold, delivered, or transferred by a seller shall be the lowest quoted price published in the October 2, 1941 issue of Platt's Oilgram and the Chicago Journal of Commerce, the October 8, 1941 issue of the National Petroleum News or other publications designated by this Office, for a product of the same class, kind, type, condition and grade. Where such products are sold and prices are quoted on a delivered basis, then the maximum delivered price shall be the lowest quoted delivered price so published. Where products are sold and prices are quoted on an f.o.b. shipping point basis, then the maximum f.o.b. price shall be the lowest quoted f.o.b. price so published. Quotations in the above named periodicals for the States of California, Oregon, Washington, Arizona and Nevada shall not be used in determining maximum prices."

Norfolk deliveries were made to James River's trucks and barges for Arkansas by Gulf Oil Company at its Norfolk terminal; and the National Petroleum News of October 8th published a price of $.075 per gallon for gasoline in Norfolk harbor with the explanation that "prices are of refiners, f.o.b. their refineries and their tanker terminals, and of tanker terminal operators, f.o.b. their terminals." This published price plus the increase authorized by OPA amounts to $.087 per gallon, which, it will be seen, is in excess of the prices of $.07816 and $.0795 charged James River.

James River contends that it was an ocean terminal operator and as such was a dealer of a different class from those to whom the regulation was intended to apply: but there are two answers to this, either of which is conclusive. In the first place, there is nothing in the regulation which prevents its applying to sales made to a wholesale distributor who is the owner of an ocean terminal. The cost of the service rendered by such a terminal is a minor element in the price of gasoline; and the regulation does not provide for any special consideration of wholesalers equipped with this facility or indicate, in any way, that they should be classified differently from other wholesale distributors. In the second place, James River had ceased to be the operator of the terminal at the time of the sales in question and was purchasing gasoline on the same basis and handling it in the same way as were the other wholesale dealers and distributors with whom it was in competition. The mere fact that it owned an idle ocean terminal plant manifestly did not entitle it to special classification, or exempt it from paying the ceiling price established for the business in which it was actually engaged.

A fact which James River overlooks in its argument, and which was overlooked in the judgment of the court below, is that the sales between March and November 1943 were made pursuant to a course of dealing fundamentally different

824

from that which obtained in the year 1941. There is nothing in the law which forbade this change in the course of dealing, and no reason why the prices prevailing in 1941 under one course of dealing should be accepted as the ceiling for prices in 1943 under an entirely different course of dealing for which other ceiling prices were established. To be concrete, there is no reason why the prices established for the gasoline delivered by ocean carrier to the terminal in 1941 should control the price of gasoline delivered from a terminal into cars and barges in 1943, in face of a regulation providing specifically that the ceiling in the latter case should be otherwise determined.

As pointed out above, under the clear wording of the publication which the OPA adopted in its pricing policy, the prices which are determinative are those of "refiners" f.o.b. their refineries and their tanker terminals and of "tanker terminal operators" f.o.b. their terminals. There can be no question, therefore, but that the prices established under the publication would have provided the ceiling if the sales here had been by Gulf to James River. There is no reason in law or in common sense why the same ceiling should not apply to sales made by Arkansas of gasoline purchased from and delivered by Gulf under precisely similar conditions.

James River attaches great importance to the letter of the Assistant General Counsel of OPA, to which reference has been made, holding that prices could not be established by Arkansas under subsection (b) (1) of the regulation. At that time, however, Arkansas was making sales to James River under an agreement substantially similar to the one in effect in October of 1941, and had raised the price by slightly more than half a cent a gallon. It was shortly after this correspondence with the OPA that plaintiff changed the conditions of sale for the first time, and began selling f.o.b. its Louisiana refinery. Whether plaintiff's ceiling price between May and July of 1942, when it made sales in the same manner as in October of 1941, or between July of 1942 and March of 1943, when it made sales f.o.b. its refinery, was to be determined under (b) (2), as

the Assistant General Counsel held in his letter, we need not determine. The fact is that beginning with March 1943 sales were made on an entirely different basis; and it is only for these that plaintiff is seeking recovery. As indicated above, we think it clear that the ceiling price for these is to be determined under subsection (b) (1) of the regulation.

A few of the sales in controversy were made at Richmond. As Richmond prices were not given in a publication specified in subsection (b) (1) of the regulation, we cannot look to that subsection for the establishment of the ceiling price. Subsection (b) (2) provides for establishing the ceiling price on the basis of prices charged by the seller during a base period; but since Arkansas had made no sales in Richmond during the base period, we cannot look to that subsection. We accordingly look to subsection (b) (3) which provides that where the maximum price for a petroleum product at a given shipping or delivery point cannot be determined under the first two subsections, a seller may sell at the maximum price of his most closely competitive seller of the same class. The Richmond sales were from the terminal of the American Oil Company to James River's trucks there, and Arkansas sold to defendants at a price lower than it paid American. Arkansas determined that its maximum price was that which American, as its most closely competitive seller, charged it. The objection made by James River to this conclusion is that it was the only seller in its class in Virginia, since it was the operator of a tank terminal; but as we have seen above, there is nothing in this contention.

As the prices both at Norfolk and at Richmond were less than ceiling prices, it is not necessary to consider what would be the effect of a contract providing for prices in excess thereof upon the right to recover in an action for goods sold and delivered. Where the only thing illegal in connection with a sale and delivery of merchandise is a contract for a price in excess of a legal price, the question arises whether the seller may not recover the lawful price in an action for goods sold and delivered, on the theory that the illegal contract need not be relied on for recovery

and that, in equity, good conscience and common honesty, the purchaser should account for the just and lawful value of the goods received. The question also arises whether the penalties provided by the statute were not intended to be exclusive, so that one who exacts an unlawful price may be mulcted in triple damages and prosecuted criminally, without, however, permitting the purchaser, who is a party to the unlawful contract, to enrich himself dishonestly by refusing to pay the lawful price for the goods purchased. In the view that we take of the facts, however, none of these questions need be decided.

The judgment appealed from will be reversed and the case will be remanded with direction to enter summary judgment for Arkansas in accordance with the prayer of its complaint.

Reversed.