**Azam v. Carroll Independent Fuel, LLC, No. 1793 of the 2017 Term, Opinion by Moylan J.**

**THE FOUR CENT RULE – THE HISTORIC CONTEXT – A. MARYLAND GASOLINE PRODUCTS MARKETING ACT OF 1973 – B. THE DIVESTITURE ACT OF 1974 AND 1975 – C. THE DIVESTITURE LAW IN LIMBO – D. THE FOUR CENT RULE – THE PRESENT CASE – STANDARD OF REVIEW – THE FOUR CENT RULE DOES NOT APPLY TO JOBBERS – THE FOUR CENT RULE: A REQUIREMENT OF A MARKETING AGREEMENT – THE LAST ANTECEDENT RULE – WHAT'S GOOD FOR THE VARSITY IS GOOD FOR THE JUNIOR VARSITY: A FLAWED ANALOGY – AFTERTHOUGHT**

Circuit Court for Howard County
Case No. 13-C-16-110085

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1793

September Term, 2017
_____

KHALID AZAM

v.

CARROLL INDEPENDENT FUEL, LLC
_____

Nazarian,
Leahy,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Moylan, J.
_____

Filed: January 2, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Our effort to pin a clear label on this appeal is at least tentatively inhibited by the ghost of anachronism. The appellant invokes the so-called Four Cent Rule. The Four Cent Rule was initially enacted by the General Assembly in 1978.[1] It was expressly designed to solve (or at least to ameliorate) what was then perceived to be a serious problem involving the oversight and regulation of the marketing of gasoline and gasoline products to gasoline stations or service stations throughout Maryland. Since the legislative session of 1978, however, the larger problem that gave rise to the Four Cent Rule has, for reasons independent of the Four Cent Rule, effectively, if not entirely, disappeared. That disappearance accounts for the relative scarcity, if not total absence, of caselaw dealing with the Four Cent Rule. We have found no Maryland opinion even mentioning the Four Cent Rule. The rule may, indeed, have become obsolete at the very moment of its birth.

The appellant, however, now picks up this legislative relic and brandishes it as if of yore. His problem is that the circumstances surrounding his present invoking of the rule are different from the problem that the rule was designed to solve (or at least to ameliorate) in the first instance. The invocation of the Four Cent Rule at this late moment of time at least smacks of anachronism. It may be that it is being called upon to solve a problem out of its time.

## The Historic Context

Because we are groping with subject matter that is relatively arcane, it behooves us to provide at least a thumbnail sketch of the historic context of the Four Cent Rule before

---

[1] By Chapter 993 of the Acts of 1978.

we even presume to identify the litigants in this case or to describe the nature of the litigation. Let us set the scene before this case's characters come on stage.

## A. Maryland Gasoline Products Marketing Act Of 1973

The Maryland General Assembly first took official notice of a growing problem in 1973 with the passage of the Maryland Gasoline Products Marketing Act.[2] In <u>Becker v. Crown Central Petroleum Corp.</u>, 26 Md. App. 596, 340 A.2d 324, <u>cert. denied</u>, 276 Md. 738 (1975), Chief Judge Orth for this Court spelled out the nature of the general problem:

> The General Assembly of Maryland at its session held in 1973 made known <u>its concern about the distribution and sale through marketing arrangements of petroleum products in this State. It</u> declared that the economy, the public interest, welfare and transportation were vitally affected thereby and <u>found it necessary to define the relationships and responsibilities of the parties to certain agreements pertaining thereto.</u>

26 Md. App. at 598 (emphasis supplied).

The core problem was the competitive imbalance between the major oil companies and the smaller independent service station operators, which the Act defined as "dealers."[3]

The major problem as initially perceived was that the major oil companies, referred to variously as "distributors," "producers," or "refiners," were inclined to favor service stations that were owned by them and operated by their own personnel. In their marketing

---

[2] By Chapter 662 of the Acts of 1973. The Act is now codified as Maryland Code, Commercial Law Article, Sect. 11–301 <u>et seq</u>.

[3] (d) <u>Dealer</u>. — (1) "Dealer" means a person engaged in the retail sale of gasohol or gasoline products under a marketing agreement, at least 30 percent of whose gross revenue is derived from the retail sale of gasoline products.
(2) "Dealer" does not include an employee of a distributor.

Commercial Law Article, Sect. 11–301(d).

agreements, the oil companies would favor their own directly owned and operated stations over those owned and operated by independent dealers. In Comptroller of the Treasury v. Crown Central Petroleum Corp., 52 Md. App. 581, 451 A.2d 347 (1982), Judge Wilner described the legislative concerns that led to the original 1973 Act.

> The 1973 law addressed what the General Assembly evidently saw as an imbalance of economic power between the oil companies and their dealers that it believed was detrimental to the State and in need of redress. The law required the oil companies to disclose certain information to prospective service station dealers before entering into marketing agreements with them; it precluded certain requirements and restrictions onerous to the dealers from being inserted in those marketing agreements; and it imposed certain requirements and restrictions upon the termination of the agreements.

52 Md. App. at 583 (emphasis supplied; footnote omitted). See, e.g., Akparewa v. Amoco Oil Co., 138 Md. App. 351, 771 A.2d 508 (2001).

In an effort to restore and to guarantee some balance between the major oil companies and the "little guys" or "dealers," the Act imposed a series of requirements on the "distributors." Becker v. Crown Central listed a series of ameliorative devices aimed at redressing the "imbalance of economic power between the oil companies and their dealers."

> [T]he Legislature adopted a comprehensive scheme covering three general areas: (1) it required certain information to be given by a distributor to a prospective dealer; (2) it delineated certain provisions to which marketing agreements (were) subject; and (3) it provided sanctions for violations.

26 Md. App. at 599 (emphasis supplied).

In making it clear that the General Assembly was dealing with major oil companies and not with everyone who bought gasoline wholesale and sold it at retail, the Court of

3

Appeals, in <u>Governor of Maryland v. Exxon Corp.</u>, 279 Md. 410, 370 A.2d 1102 (1977), defined "producer" and "refiner" in no uncertain terms.

> Likewise, we find, as did the trial court, that <u>the term 'producer or refiner' is not unconstitutionally vague. A producer, as used in the Act, is <u>a person, firm or corporation engaged in the production of crude oil</u>, i.e., <u>extracting crude oil from the earth. A refiner is one engaged in refining crude oil.</u>

279 Md. at 455 (emphasis supplied).

## B. The Divestiture Act of 1974 And 1975

If the General Assembly in 1973 was still feeling out the nature and scope of the problem it was first addressing, it opened the campaigning season of 1974 with a full scale frontal offensive. Instead of merely limiting the ways in which the major oil companies, the "refiners," "producers," and "distributors," could favor their own directly owned and/or controlled service stations over the independent "dealers," the little guys, the General Assembly undertook to eliminate the favored category in one fell swoop. It went straight for the jugular. In <u>Comptroller v. Crown Central Petroleum</u> this Court described the legislative motivation:

> [T]he legislature was reacting to what it perceived as a growing and harmful trend toward vertical integration in the marketing of petroleum products. <u>Evidence was presented to the legislature that the oil companies had begun to change their marketing strategies, that they were beginning to favor stations owned and operated directly by them, with their employees, in lieu of the more traditional dealer-operated stations</u>, and that, in furtherance of that policy, <u>they discriminated against dealer-owned or operated stations in the allocation of product and in various pricing policies.</u>

52 Md. App. at 584 (emphasis supplied).

The legislative response was swift and sure. Chapter 854 of the Acts of 1974 enacted what became commonly referred to as the Divestiture Law. It is now codified as Maryland

4

Code, Business Regulation Article, Sect. 10–311. The Divestiture Law was designed for the stated purpose of "'prohibiting producers or refiners of petroleum products from operating retail service stations.'" 52 Md. App. at 584. The elimination of producer-owned or producer-operated service stations was actually accomplished by a one-two punch, however, as Chapter 608 of the Acts of 1975 amended and supplemented its 1974 predecessor. Judge Eldridge described the first prong in Cities Service Co. v. Governor of Maryland, 290 Md. 553, 431 A.2d 663 (1981):

> [A]fter July 1, 1974, no producer or refiner of petroleum products shall open a retail service station in Maryland and operate it with company personnel or a subsidiary company[.]

290 Md. at 555–56 (emphasis supplied).

That first prong in 1974 prohibited the opening of new service stations owned or controlled by the major oil companies. Those already in operation were "grandfathered" in and were given a one-year lease on life before the second prong became operational in 1975.[4]

> [T]he Legislature went further and required that after July 1, 1975, no producer or refiner of petroleum products shall operate any retail service station in Maryland with company personnel or a subsidiary company, regardless of when the station may have been opened, and that all stations must be operated by retail service station dealers.

290 Md. at 556 (emphasis supplied).

## C. The Divestiture Law In Limbo

---

[4] When a number of the major oil companies challenged the constitutionality of the Divestiture Law, the divestiture dates were, by subsequent legislation, effectively delayed first until August of 1977 and ultimately until July of 1979.

The root problem, of course, had been the competitive imbalance between the favored gas station dealers owned or directly controlled by the major oil companies and the non-favored independent dealers. The Divestiture Law effectively eliminated the imbalance by categorically eliminating the favored class. There were no longer two broad categories of service stations ranged against each other. As long as the Divestiture Law remained in constitutional good health, therefore, the problem of imbalance was largely solved and lesser ameliorative adjustments were no longer necessary.

Almost immediately, however, the constitutional vitality of the Divestiture Law was challenged. Chapter 854 of the Acts of 1974 was signed into law on May 31, 1974. As of June 17, 1974, the Exxon Corporation filed suit in Anne Arundel County, seeking a declaratory judgment that the Divestiture Law was unconstitutional and invalid. A number of the other major oil companies joined in the action. At the conclusion of the trial, the Circuit Court for Anne Arundel County declared the law to be unconstitutional. The State appealed and the Court of Appeals issued a writ of certiorari. On February 18, 1977, the Court of Appeals issued a unanimous opinion, authored by Judge Eldridge, reversing the Anne Arundel County trial court and holding the Divestiture Law to be constitutional. The constitutionality problem, however, was only in temporary remission.

The Exxon Corporation, joined by the other major oil companies, applied for and received a writ of certiorari from the Supreme Court. Justice Stevens's opinion gave an excellent description of the relationship between a distributor or refiner, on the one hand, and the retail service stations they directly control, on the other:

> All of the gasoline sold by Exxon in Maryland is transported into the State from refineries located elsewhere. Although Exxon sells the bulk of this gas to wholesalers and independent retailers, <u>it also sells directly to the consuming public through 36 company-operated stations. Exxon uses these stations to test innovative marketing concepts or products.</u> Focusing primarily on the Act's requirement that it discontinue its operation of these 36 retail stations, Exxon's complaint challenged the validity of the statute on both constitutional and federal statutory grounds.

<u>Exxon Corp. v. Governor of Maryland</u>, 437 U.S. 117, 121–22, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978) (emphasis supplied; footnotes omitted). On June 14, 1978, that Court issued a 7–1 decision, affirming the constitutionality of Maryland's Divestiture Law.

Chapter 854 creating the Divestiture Law had been signed into law on May 31, 1974. The final Supreme Court imprimatur on the law's constitutionality was not filed until June 14, 1978. The Divestiture Law, therefore, had been in a state of constitutional Limbo for just over four years. That state of prolonged uncertainty is an important factor in the present case. Had the Divestiture Law's constitutionality been immediately apparent, its effective elimination of the competitive imbalance problem would have been concomitantly immediately apparent and no lesser ameliorative chipping away at the imbalance would have been necessary. Because the constitutionality of the Divestiture Law was not immediately apparent, however, there was no reason for the legislative attack on the imbalance problem to go into suspended animation for four years. Ameliorative or mitigating redress of the imbalance problem during that four-year interim, albeit in a sense contingent, was not at all inappropriate.

**D. The Four Cent Rule**

Foremost among the ameliorative measures was the Four Cent Rule. Chapter 993 of the Acts of 1978 was signed into law on May 29, 1978, and is now codified as Maryland Code, Commercial Law Article, Sect. 11–304(l). It provides:

> (l) <u>Wholesale price of gasoline to noncontrolled outlets</u>. — (1) <u>A distributor who sets the retail price of gasoline through controlled outlets shall provide those noncontrolled outlets that it supplies</u> with gasoline products <u>at a wholesale price of at least 4 cents per gallon under the lowest price posted</u> for each grade of gasoline <u>at any controlled outlet.</u> Violation of this subsection constitutes price discrimination as prohibited by § 11–204(a)(3) of this title.

(Emphasis supplied).

The base figure from which the "4 cents per gallon" is to be subtracted is "the lowest price posted for each grade of gasoline at any controlled outlet." Sect. 11–301(b) defines precisely what the law means by the term "controlled outlet":

> (b) <u>Controlled outlet</u>. — <u>"Controlled outlet" means an outlet which is operated by a distributor</u> or operated by company employees, a subsidiary company, commissioned agent, or by any person who manages the outlet on a fee arrangement with the distributor.

(Emphasis supplied).

The indisputable purpose of the Four Cent Rule was to eliminate (or at least to ameliorate) the imbalance or disparity between the independent retail dealers, the "uncontrolled outlets," and the service stations owned or operated by the major oil companies, the "controlled outlets." Chapter 993's Preamble left no possibility for doubt.

> The General Assembly finds that <u>distributors of gasoline have sold gasoline</u> in the State <u>through retail outlets operated by them</u> at prices below or substantially the same as the wholesale price at which the same distributors have sold gasoline to their retail dealers. Because of this pricing policy, <u>retail dealers have been unable to fairly compete with the retail outlets operated by the distributors</u>, and as a result, some retail dealers have ceased

8

their business operations and <u>a substantial number of retail dealers are faced with unfair competitive pricing</u> practices which may force them out of business, thereby substantially reducing the number of independent retail dealers in this State. <u>While the outlets operated by the distributors are in these cases selling gasoline at their retail outlets for a price less than that of their franchised dealers, the General Assembly is concerned that as these distributor owned operations become greater in number</u> in this State, and acquire a larger number of prime sites, this <u>competition in the sale of gasoline to the public shall be diminished, resulting in a potential decrease in independent competitors</u>, creating the potential for the distributors to take advantage of their then dominant and potentially collective monopolistic position in the retail market to substantially increase the retail price of gasoline to the consuming public in this State. <u>The intent and purpose of this Act is to preserve competition among retail service stations in this State</u> for the benefit of the consuming public <u>and to assure that there will continue to be substantial competition</u> among the several types of retail service stations in this State <u>by providing a basis upon which all competitors shall be on an equal basis insofar as price is concerned.</u>

(Emphasis supplied).

Looking forward, however, to a possible day when there might no longer be any "controlled outlets," there might no longer be any minuend from which the subtrahend of "4 cents per gallon" could be subtracted. The four-cent differential would be floating free with no point of reference. How then might we compute the "remainder"? Self-evidently, the Four Cent Rule did not look forward to such a day. As a functional subtrahend, can the Four Cent Rule even exist in a world without discernible minuends?

With that historic context behind us, we turn to the case at hand.

## The Present Case

The appellant is Khalid Azam. He owns a retail gasoline service station at 8207 Liberty Road in Baltimore County, doing business as "Liberty BP." He is supplied with

9

BP branded motor fuels for resale at his station by the appellee, Carroll Independent Fuel, LLC ("CIF").

CIF purchases the motor fuels that it then resells to Liberty BP from BP Products North America, Inc. ("BP"), a major refiner of motor fuels and other petroleum products. CIF, as a middleman, sells motor fuels under the BP brand name to numerous service station operators, including the appellant, for retail resale to motorists. At some of these service stations, CIF itself owns the underlying real estate and leases the stations to the operators.

CIF purchases the motor fuels from BP under a "Branded Jobber Contract." Under such a contract, CIF is not authorized to use BP's trademarks or to permit the service stations with which it deals to do so without BP's prior written approval and without strict adherence to the requirements and conditions set forth therein. The trademarks and other brand identifications are owned by "BP, PLC," which is organized under the laws of the United Kingdom.

CIF sells BP branded motor fuels to the appellant under a "Dealer Supply Agreement." Pursuant to the agreement, the appellant is authorized to use BP's trade names, trademarks, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes, and the like in connection with the advertising and sale of BP branded fuels at Liberty BP. Under the Dealer Supply Agreement, CIF sets the per gallon price for the BP branded motor fuel it sells to the appellant.

On December 30, 2016, the appellant filed a Complaint against the appellee in the Circuit Court for Howard County. The Complaint sought a declaratory judgment and

10

injunctive relief. The heart of the appellant's Prayer For Relief is a declaration that CIF is required to give the appellant the benefit of the Four Cent Rule.

> (b) The issuance of a declaratory judgment that the <u>Defendant is required</u> by § 11–304(l)(1) of the Maryland Marketing Act [Commercial Law Article] <u>to provide Liberty BP with gasoline at wholesale prices</u> for each grade of gasoline that are <u>at least 4 cents-per-gallon under the lowest price posted</u> for each grade of gasoline <u>at Carroll's Controlled Outlets</u>, including but not limited to, the prices posted for each grade of gasoline at Randallstown Outlet[.]

(Emphasis supplied).

## Standard Of Review

The case came on for resolution before Judge Lenore R. Gelfman. There were cross-motions for summary judgment. On October 24, 2017, Judge Gelfman denied the appellant's motion for summary judgment and granted CIF's motion for summary judgment. On October 25, 2017, Judge Gelfman filed a very thorough 14-page Memorandum and Opinion explaining in meticulous detail her decision.

Both parties agree that in this case there was no genuine issue as to any material fact and that summary disposition of the issues was, therefore, appropriate. The critical question before us is that of whether Judge Gelfman's interpretations of the pertinent statutes were correct as a matter of law, a question that we review <u>de novo</u>. We hold that they were.

Judge Gelfman gave two separate reasons for her decision in favor of CIF. Either of those reasons, standing alone, would justify her ultimate decision.

## The Four Cent Rule Does Not Apply To Jobbers

The Four Cent Rule itself is codified as Sect. 11–304(l)(1) of the Commercial Law Article. Nestled immediately under it is its companion sub-provision, 11–304(l)(2).

11

(2) The provisions of this Act do not apply to independent jobbers and farm cooperatives.

(Emphasis supplied). Being a "farm cooperative" is not in any way pertinent to what is now before us and we shall have no occasion to mention it further. "Independent Jobber," on the other hand, looms large. Sect. 11–301(h) defines the term.

(h) Independent jobber. — "Independent jobber" means an individual or corporation who purchases gasohol or gasoline products from a wholesaler for resale to a dealer.

In her Memorandum and Opinion, Judge Gelfman, applying the statutory definition, found expressly that CIF was a "jobber." She also found that the contract between CIF and BP Products of North America, Inc. was a **"Branded Jobber Contract."**

Defendant is a gasoline distributor that purchases gasoline from BP Products North America, Inc. and other suppliers, and sells it at wholesale to Plaintiff and other independent retail locations. Under its "Branded Jobber Contract" with BP Products North America, Inc., Defendant is granted the exclusive right to supply Plaintiff with BP branded gasoline and is further authorized to permit Plaintiff to use BP, PLC's trademarks and other trade dress materials. Defendant also supplies its gasoline to retail locations that it directly controls, manages, and/or owns and where gasoline is sold directly to consumers. These retail locations directly compete with Plaintiff and other independent retail locations for the sale of gasoline to consumers.

(Emphasis supplied).

Just such a tripartite relationship was before the Court of Appeals in Chevron, U.S.A. v. Lesch, 319 Md. 25, 570 A.2d 840 (1990). Walker's Chevron was the retail service station or independent dealer in that case. It purchased its gasoline and other petroleum products from Bay Oil, Inc., an independent jobber. That jobber, in turn, purchased its gasoline wholesale from Chevron, U.S.A., a national oil company. Judge

12

McAuliffe described the three-tiered relationship between the dealer, the jobber, and the refiner.

> Walker's Chevron owned and operated an automobile service station business located on Conowingo Road in Bel Air, Maryland. It leased the premises, and also purchased gasoline, oil, and lubricants from Bay Oil, Inc. (Bay Oil), a jobber. Walker's Chevron was a "branded station"; that is, it displayed the signs and colors of a particular brand, Chevron, and sold only that brand of gasoline and oil. Bay Oil purchased the Chevron products that it sold to Walker's Chevron from Chevron U.S.A., Inc. (Chevron U.S.A.), a national oil company.

319 Md. at 27 (emphasis supplied; footnotes omitted). The role of the jobber, Bay Oil, in Chevron v. Lesch is indistinguishable from the role of CIF, the jobber in the present case. CIF was the middleman, the jobber, between the appellant and BP.

Judge Gelfman's Memorandum and Opinion relied on the same close relationship between the present case and Chevron v. Lesch.

> The same relationship is present in this matter. It is undisputed that Defendant purchases branded gasoline from BP Products North America, Inc. Plaintiff in turn purchases this gasoline from the Defendant. The Court finds further support under the plain meaning of "wholesaler." Naturally, a wholesaler is one who sells goods at "wholesale." Black's Law Dictionary defines "wholesale" as "[t]he sale of goods or commodities usu, to a retailer for resale, and not to the ultimate consumer." WHOLESALE, Black's Law Dictionary (10th ed. 2014). The Parties are in agreement that Defendant purchases gasoline from BP Products North America, Inc. and in turn resells it to Plaintiff for further sale to consumers. Accordingly, the Court finds that Defendant meets the definition of "independent jobber."

(Emphasis supplied).

It is a standard definition. See, e.g., Wikipedia, Jobber (fuel), https://en.wikipedia.org/wiki/Jobber_(fuel) (last visited 10 December 2018). ("A jobber, or petroleum marketer, is a person or company that purchases quantities of refined fuel

13

from refining companies (e.g. BP, Shell, Exxon), either for sale to retailers (e.g., gasoline stations), or to sell directly to the users of those products[.]")

The caselaw is replete with references to "independent jobbers." See Leh v. General Petroleum Corp., 382 U.S. 54, 61–62, 86 S. Ct. 203, 15 L. Ed. 2d 134 (1965) (plaintiff distributors who purchased refined gasoline from refiners and sold the gasoline to their service station customers referred to by the Court as "independent jobbers"); Arkansas Fuel Oil Co. v. Kirkmyer, 158 F.2d 821, 822 (4th Cir. 1947) (James River described as an "independent jobber," where James River purchased petroleum products from Arkansas Fuel Oil Co., a producer of gasoline, and sold the gasoline to service station dealers); United States v. Standard Oil Co., 316 F.2d 884, 898 (7th Cir. 1963) (companies that purchased gasoline from Phillips Petroleum Co. and resold the gasoline to service station dealers, referred to as "independent jobbers"); In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432, 436 (9th Cir. 1990) (distributors who purchased gasoline produced by major oil companies and resold the gasoline to various service stations and other producers referred to by the Court as "independent jobbers"); Marathon Oil Co. v. Mobil Corp., 530 F. Supp. 315, 317–18 (N. D. Ohio 1981) (Court characterized oil companies that purchase branded motor fuel from Mobil Oil Corp. and sold the motor fuel to gas station retailers as "independent branded jobbers").

The very statute creating the Four Cent Rule could not have made the exemption from the rule for independent jobbers more clear, as the Memorandum and Opinion further noted:

Commercial Law § 11–301(h) defines "independent jobber" as an "individual or corporation who purchases gasohol or gasoline products from a wholesaler for resale to a dealer." <u>The General Assembly has placed a special exception on "independent jobbers" and the same are not required to comply with the "four cent rule."</u> § 11–304(l)(2) ("The provisions of this act do not apply to independent jobbers and farm cooperatives."). Accordingly, even if the parties' Supply Agreement is a "marketing agreement" <u>the Defendant is exempt from the "four cent rule"</u> under § 11–304(l)(1) <u>if it qualifies as an "independent jobber."</u>

(Emphasis supplied).

CIF did so qualify as an "independent jobber" and was, therefore, exempt from the Four Cent Rule, as Judge Gelfman ruled:

[T]he Court finds that <u>Defendant is an "independent jobber"</u> as defined in § 11–301(h), <u>and is therefore exempt from the requirements of § 11–304(l)(1).</u> Accordingly, the Court will deny Plaintiff's Cross-Motion for Summary Judgment and will grant Defendant's Motion for Summary Declaratory Judgment.

(Emphasis supplied).

By way of our independent <u>de novo</u> review, we affirm Judge Gelfman in this regard.

### The Four Cent Rule: A Requirement Of A Marketing Agreement

CIF's exemption, as a jobber, from the Four Cent Rule is dispositive of this appeal. It is, therefore, a case of carrying coals to Newcastle even to mention the fatal lack of a marketing agreement. We nonetheless feel that Judge Gelfman's alternative and independent <u>ratio decidendi</u> in that regard is worthy of note.

In the long term effort of the General Assembly to redress the perceived competitive imbalance in the marketing of petroleum products, the centrality of the "marketing agreement" has always been of pivotal significance. The core provision of the legislative

15

regulation is, of course, the Gasohol and Gasoline Products Marketing Act of 1973. In Sect.

11–302 the Legislature set forth the policy consideration animating the Marketing Act. The

"marketing agreement" is a critical component of that legislative policy.

> (a) Legislative finding and declaration. — The General Assembly finds and declares that since **the distribution and sale through marketing arrangements** of petroleum products in the State vitally affect the economy of the State, and its public interest, welfare, and transportation, it is necessary to define the relationships and responsibilities of the parties to **certain agreements pertaining to these marketing arrangements.**

(Emphasis supplied).

Accordingly, Sect. 11–301, dealing with definitions of terms in the Marketing Act,

very precisely defines "marketing agreement" in subsection 11–301(i):

> (i) Marketing agreement. — "Marketing agreement" means an oral or written agreement between a distributor and a dealer under which the dealer is granted the right, for the purpose of engaging in the retail sale of gasohol or gasoline products supplied by the distributor, to:
> (1) Use a trademark, trade name, service mark, or other identifying symbol or name owned by the distributor; or
> (2) Occupy premises owned, leased, or controlled by the distributor.

(Emphasis supplied).

Subsection 11–304 then goes on to set forth "Requirements of [the] marketing

agreements" of which there are 13. The Four Cent Rule is subsection 11–304(l). Judge

Gelfman's Memorandum and Opinion identified the existence of a "marketing agreement"

as one of the two issues before her:

> The Parties' focus their arguments on whether their December 20, 2005, Dealer Supply Agreement is a "marketing agreement[.]"

16

Her conclusion was that the Dealer Supply Agreement of December 20, 2005, was not a Marketing Agreement within the contemplation of the Gasoline Products Marketing Act:

> For the reasons that follow, the Court finds that the Parties' <u>December 20, 2005, Dealer Supply Agreement is not a "marketing agreement"</u> as defined in § 11–301(i), and therefore <u>the Defendant is not required to comply with the "four-cent rule"</u> as defined under § 11–304(l)(1).

(Emphasis supplied).

Under the Branded Jobber Contract between CIF and BP, CIF is not authorized to use BP's trademarks or to permit the service stations with which it deals to do so without BP's prior written approval and without strict adherence to the requirements and conditions set forth therein. The trademarks and other brand identifications are owned by BP. Judge Gelfman's Memorandum and Opinion recognized this fact as she ruled:

> In sum, the Court finds that <u>to constitute a "marketing agreement"</u> under § 11–301(i), <u>the agreement must grant the dealer the right to use a "trademark," "trade name," "service mark," or other "identifying symbol or name" that is owned by the distributor.</u> As a matter of law <u>the Plaintiff cannot establish that the</u> December 20, 2005, <u>Dealer Supply Agreement meets the requirements necessary to constitute a "marketing agreement,"</u> under § 11–301(i). <u>Since the parties' Supply Agreement is not a "marketing agreement,</u> as a matter of law <u>the Defendant is not required to comply with the "four cent rule"</u> established in § 11–304(l)(1).

(Emphasis supplied).

## The Last Antecedent Rule

In a heroic effort to wriggle out of the confining restraints of precise legislative definitions, the appellant reaches way back to resurrect a justifiably neglected and generally disdained grammatical relic, the Last Antecedent Rule. It is a "minor grammatical rule,"

17

although not to be found in the grammar books themselves. According to the Last Antecedent Rule, if there are in a sentence a series of nouns or noun phrases followed by a limiting provision, that limiting provision will be attached only to the last item in the series and not to each item in the series. The rule does not purport to apply all of the time, just sometimes. How might this apply to the present case?

In Commercial Law Article, Sect. 11–301(i)'s definition of "marketing agreement," there is, to be sure, a series. It consists of four items: "trademark, trade name, service mark, or other identifying symbol or name." That series is followed by a limiting or qualifying phrase: "owned by the distributor." Does that qualifier "owned by the distributor" apply to each of the four items in the series or only to the last one?

Let us focus on "trademark," the first of the four items in the series, for convenience of analysis. If the limitation "owned by the distributor" applied to "trademark," there would have been no valid "marketing agreement." If CIF were deemed to be the "distributor," there would have been no valid "marketing agreement" because CIF did not own the "trademark." If, on the other hand, BP were deemed to be the "distributor," there would have been no valid "marketing agreement" because CIF had no right to give the appellant the right to use the trademark owned by BP without BP's express prior approval. The same analysis would apply to the second and third items in the series: "trade name" and "service mark."

If the qualifying phrase "owned by the distributor," on the other hand, applied only to the fourth and "last" of the four possible antecedents, all of the appellant's problems would disappear. CIF could give the appellant the right to use an item with an undesignated

18

trademark owned by somebody but not otherwise identified. Under the Last Antecedent Rule, there would be no need for it to be "owned by the distributor" if it were not the last antecedent. Anterior antecedents don't count. The Memorandum and Opinion stated the appellant's argument.

> Plaintiff disagrees, and argues that to constitute a "marketing agreement," the Supply Agreement need only confer upon Plaintiff the right to use a trademark, and not necessarily Defendant's trademark. To support his argument, the Plaintiff asserts that both the "last antecedent rule" and the legislative intent of the General Assembly require the Court to read § 11–301(i)(1) in the same manner as the Plaintiff.

The Memorandum and Opinion restated the argument but then rejected it.

> Here, Plaintiff argues that the conjunction "or" limits the clause "owned by the distributor" to only the clause "other identifying symbol or name." Consequently, the phrase "owned by the distributor" does not apply to "trademark," "trade name," or "service mark." In Plaintiff's eyes § 11–301(i) reads ". . . use any trademark, any trade name, any service mark, or other identifying symbol or name owned by the distributor." The Court believes the Plaintiff misinterprets the "last antecedent rule" to reach this conclusion.

(Emphasis supplied).

It was in 1979 that this Court first addressed the Last Antecedent Rule in Stanbalt Realty Co. v. Commercial Credit Corp., 42 Md. App. 538, 401 A.2d 1043 (1979). We thought we had effectively laid its ghost to rest.

> The last hope of the appellant, Stanbalt Realty Company (Stanbalt), is the so-called "last antecedent rule" for construing the terms of a contract, to which rule Stanbalt clings with grim tenacity. This rule of construction, never adopted in Maryland, and of only marginal significance in the scattered jurisdictions that have called upon it, is too frail a reed to carry the appellant's burden.

42 Md. App. at 539 (emphasis supplied). We further referred to the rule as "this rather obscure little grammatical usage, that sometimes is dignified with the label 'rule' and sometimes is not[.]" 42 Md. App. at 542. <u>See also Philadelphia Indemnity Insurance Co. v. Maryland Yacht Club, Inc.</u>, 129 Md. App. 455, 479, 742 A.2d 79 (1999).

In <u>Stanbalt Realty</u> we surveyed both the academic literature and the national caselaw on the subject. The academic recognition is exceedingly scarce if not non-existent. This Court pointed out:

> The great professors of contracts, Williston and Corbin, in their respective multi-volume works do not even recognize the existence of any "last antecedent rule." In a merely subsidiary capacity, in the course of broader discussions of the use of grammar to discern the meaning of a contract, this particular grammatical usage is mentioned in passing without benefit of a formal label in a footnote in American Jurisprudence 2d and with benefit of a formal label in a footnote in Corpus Juris Secundum.

42 Md. App. at 542.

What then should we make of the so-called Last Antecedent Rule? When every decade or so it appears, it is generally little more than a persistent nuisance, demanding perhaps a single paragraph's polite attention but ultimately not controlling the case. Its sin is largely that of pretension. The caselaw uniformly acknowledges the rule's existence but then politely puts it aside, and turns to the larger rule of construction which is to discern the intent of the writer from the larger context of the entire passage. As a minor grammatical truism, the rule does no harm. It is only when it is invoked as a "Rule" and when it is embellished with capital letters that it presumes to take on an authority beyond its just desserts. It is this tendency for the rule "to punch above its weight" that we must be alert to. The observation that when a qualifier follows a series, it may well refer to the last

20

item in the series unless the clear meaning of the larger passage indicates otherwise is harmless enough, as long as we are careful not to capitalize the observation or to call it a rule.

Indeed, the last antecedent guideline might, in terms of even informal persuasiveness, have to yield to the arguably more reliable Series Qualifiers Rule, as proposed by the late Supreme Court Justice, Antonin Scalia. <u>See</u> A. Scalia & B. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>, 147 (2012):

> When there is a straightforward parallel construction that involves all nouns or verbs in a series, a preposition or postpositive modifier normally applies to the whole series.

### What's Good For The Varsity Is Good For The Junior Varsity: A Flawed Analogy

At first blush, it is hard not to sympathize with the appellant's chagrin at being denied a four-cent-per-gallon handicap by CIF. His complaint has an immediate surface appeal: "If I, as an independent dealer, have suffered from a competitive imbalance, why should it matter whether I have been hurt by BP, Exxon, or Texaco, on the one hand, or by some lesser middleman or jobber, such as CIF, on the other hand?" Such an egalitarian argument generates an automatic populist appeal.

The answer may be that although, in a given case, the impact on an individual dealer, such as the appellant, might be the same, the impact on society as a whole is by no means the same. The marketing tactics of BP, Exxon, Texaco, etc., the major producers and refiners, can have a significant impact on the market as a whole. The marketing tactics of lesser players, the middlemen and jobbers, by contrast, may not. The quantitative nature of

a problem may be an important legislative consideration. Disparate impacts do not demand a single and identical response. Society's response, moreover, is a legislative choice, not a judicial choice.

The requirements of the Maryland Marketing Act generally and of the Divestiture Law specifically were not aimed at all distributors but at a certain class of big distributors—the major integrated oil companies that were engaged in crude oil production, transportation, refining, and wholesale marketing—and not at independent jobbers or other middlemen, notwithstanding that they might also be involved in wholesale marketing but at a lesser level. The fear was that the major oil companies who controlled the source were extending that control downstream and threatening to create a monopolistic vertical integration from the oil well to the gas tank of the ultimate retail consumer. The targets of the General Assembly were unquestionably the major oil companies, those who were described as not only "distributors" but also as "producers" and "refiners."

In Governor v. Exxon Corp., Judge Eldridge described the problem that led to the passage of the Divestiture Law:

> Here the Legislature was presented with evidence that refiners and producers were favoring company operated stations in the allocation of gasoline. The Comptroller's report showed that, because of the inability to obtain adequate supplies of gasoline, some service station dealers were forced to close. Evidence was also presented that many dealer operated stations were being converted to company operation. The Legislature could reasonably conclude that control of the retail gasoline market by producers and refiners would decrease competition and that the continued existence of independent retail dealers was necessary to preserve competition. Exclusion of producers and refiners may conceivably be a reasonable means of preserving competition and preventing monopolistic control of gasoline marketing by a few large oil companies.

279 Md. at 427 (emphasis supplied; footnote omitted).

The heart of the appellant's complaint is a challenge to such legislative differentiation in selecting its targets. The appellant argues that if a remedial sanction such as the Divestiture Law or the Four Cent Rule applies to a major oil company such as BP (or Exxon or Texaco), then it must also necessarily apply to a jobber or middleman such as CIF, who in a given case, like the present one, might do just as much harm to one specific victim as BP might do, and cannot, therefore, be entitled to an exemption from a sanction that applies to BP.

In reviewing on certiorari the constitutionality of Maryland's Divestiture Law, the Supreme Court in Exxon Corp. v. Governor of Maryland also noted that Maryland's curative sanctions were aimed at "producers or refiners."

> The Maryland statute is an outgrowth of the 1973 shortage of petroleum. In response to complaints about inequitable distribution of gasoline among retail stations, the Governor of Maryland directed the State Comptroller to conduct a market survey. The results of that survey indicated that gasoline stations operated by producers or refiners had received preferential treatment during the period of short supply. The Comptroller therefore proposed legislation which, according to the Court of Appeals, was "designed to correct the inequities in the distribution and pricing of gasoline reflected by the survey."

437 U.S. at 121 (citation omitted).

That precise issue of legislative differentiation was a critical question when the major oil companies challenged the constitutionality of the Divestiture Law before the Court of Appeals in Governor v. Exxon Corp., 279 Md. at 438–40. The oil companies argued that to subject them, as major players, to the sanctions of the Divestiture Law while

23

exempting lesser players, such as jobbers and other middlemen, from the sanctions, denied

the oil companies the equal protection of the law. Their argument was:

> The oil companies argue, and the trial court held, that the divestiture
> provisions of the Act constitute a denial of the equal protection of the laws
> in that <u>they prohibit only producers and refiners of petroleum products from
> operating retail service stations while permitting 'wholesalers, mass
> merchandisers, food retailers, and gasoline marketers' to operate retail
> service stations.</u> It is claimed that the classification is arbitrary and without
> any rational basis.

279 Md. at 438 (emphasis supplied; footnote omitted).

Judge Eldridge's opinion for the Court made it clear that for the Maryland General

Assembly to have made a distinction, in applying the sanctions of the Divestiture Law,

between "producers and refiners on the one hand, and other sellers of petroleum products

on the other" was not arbitrary and unconstitutional.

> <u>The statutory distinction between producers and refiners on the one
> hand, and other sellers of petroleum products on the other, is not arbitrary.</u>
> As discussed previously, the Legislature determined that prohibiting
> producers and refiners from operating retail service stations was necessary to
> preserve competition.

279 Md. at 440 (emphasis supplied).

So too, the General Assembly's decision to apply the Four Cent Rule to "producers

and refiners on the one hand" but not to apply it to "other sellers of petroleum products on

the other," such as CIF, was neither arbitrary nor unconstitutional. The General Assembly

was not compelled to make such a distinction, but it was free to do so. The regulation of

the junior varsity need not be analogized to the regulation of the varsity, if the rule makers

have a rational basis for making such a distinction. If, moreover, new and modern problems

24

have replaced the problems of the 1970's, the General Assembly is always empowered to address them.

## Afterthought

In Maryland's ongoing campaign against competitive imbalance in the marketing of petroleum products, the Four Cent Rule was both a latecomer and of relatively modest firepower. With the Divestiture Law of 1974 and 1975, that larger campaign was effectively and decisively concluded. The Four Cent Rule, to be sure, is still on the books but one has to wonder whether the threat of an infantry charge still has pertinence in the aftermath of Hiroshima.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**